Filed 6/6/14  P. v. Keller CA2/7

Opinion following recall of remittitu

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B241871 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA063190) |
| v. | |
| KELLY KELLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge.  Affirmed as modified.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kelly Keller appeals from the judgment entered after a jury convicted him of multiple crimes, including murder and attempted murder, arising from a high-speed car chase and thereafter rejected his insanity defense. Keller contends the evidence failed to establish he had the specific intent to kill a passenger in one of the pursuing police cars when he fired at the car; he established as a matter of law he was insane at the time the crimes were committed; and his right to a fair trial was violated when the trial court denied his motion for mistrial and forced the lone holdout juror to continue deliberations. He also challenges the calculation of his sentence. We affirm but modify the judgment to correct two errors that created an unauthorized sentence.

**FACTUAL AND PROCEDURAL HISTORY**

1. *The Car Chase*

In the early evening of September 26, 2009 California Highway Patrol (CHP) Officer Tony Ryals initiated a traffic break on a freeway in the western San Fernando Valley. A white Cadillac emerged from the slowing cars and approached Ryals's patrol car. Driving next to the Cadillac, Ryals attempted to make eye contact with the driver but received no response. Using his car's loudspeaker, Ryals instructed the driver to pull over. The Cadillac merged toward the shoulder but, rather than exit as instructed, sped away. Ryals followed at a speed of approximately 100 miles per hour and notified dispatch of the driver's failure to yield.

The Cadillac left the freeway and turned east on Ventura Boulevard with Officer Ryals in pursuit. Alerted to the chase, CHP Officer Daniel Hernandez, who was accompanied by Kevin Caballa, a civilian "ride-along" passenger, had positioned his car on Ventura Boulevard and saw the Cadillac approach. Before the car reached Hernandez, it made a U-turn and headed west back toward Ryals, veering away from Ryals's patrol car at the last moment. Ryals reversed course and pursued the Cadillac, followed by Hernandez.

The Cadillac, traveling at a rate of 50 to 60 miles per hour, ignored several stoplights and drove through and against traffic on both sides of the street. At the intersection of Ventura Boulevard and Don Pio Drive in Woodland Hills, the Cadillac

2

swerved into the left lane, struck and killed Dean Greenwalt, a 66-year-old pedestrian, who was thrown 140 feet by the impact. A short distance later the Cadillac struck a sports utility vehicle in the rear. Although damaged, the Cadillac pulled away and continued along Ventura Boulevard.

Officer Hernandez received permission to try a "PIT" maneuver[1] and drove up to the left rear of the Cadillac. His first attempt to strike the Cadillac failed. He then positioned his car off the right bumper to try again when he heard and saw gunshots coming from the Cadillac, which had slowed to a near stop. Hernandez returned fire, and the Cadillac began driving forward again. Hernandez directed Caballa to get out of the car and continued his pursuit, joined by Ryals in the other patrol car.

As the road curved, the Cadillac crossed the opposing lanes, jumped a curb and came to rest against a chain link fence. Ryals and Hernandez parked near the Cadillac and yelled for the driver to get out of the car. There was no response. A Los Angeles Police Department SWAT team, accompanied by armored vehicles, assembled at the site by 10 p.m.

Ordered to place his hands outside the car, Keller, the driver, put one hand outside but quickly pulled it back in and shouted an obscenity. When Keller reached out of the window and grabbed the fence, SWAT team officers approached and attempted to pull him from the car. Keller tried to bite one of the officers and resisted efforts to handcuff him. After Keller ignored warnings to stop resisting, one of the SWAT officers fired a taser dart at Keller. Keller paused but then began to struggle again. When the officer could not reactivate the dart, he placed the taser gun directly on Keller's skin and activated it. Once Keller was finally restrained, the officers found a knife on the ground beneath him. An investigating officer recovered an empty 9-millimeter semiautomatic firearm from the back floorboard of the Cadillac and identified 14 bullet defects in the Cadillac consistent with someone firing through the rear window. One shot appeared to

---

[1] "PIT" stands for pursuit intervention technique. When performing a PIT, the pursuing officer attempts to disable a suspect vehicle by deliberately colliding with the car at an oblique angle, causing it to spin out of control and come to a stop.

hit the front bumper of Hernandez's car, and three impacts were identified on the undercarriage of Ryals's car.

2. *The Charges and Keller's Conviction on All Counts*

Keller was charged with the second degree murder of Greenwalt (Pen. Code, § 187, subd. (a))[2] (count 1), the attempted murders of Officers Ryals and Hernandez and Hernandez's passenger Caballa (§§ 187, subd. (a), 664) (counts 2, 3 and 13), assault on Ryals, Hernandez and Caballa with a semiautomatic firearm (§ 245, subd. (a)(1)) (counts 4-6), evading a police officer causing death (Veh. Code, § 2800.3, subd. (b)) (count 7), possession of a firearm by a felon (§ 12021, subd. (a)(1)) (count 8), and resisting executive officers (§ 69) (counts 9 and 10). Counts 2, 3, 4, 5 and 13 further alleged Keller personally used and intentionally discharged a firearm during the commission of the crimes (§ 12022.53, subds. (b), (c)); counts 1 through 8 and 13 alleged Keller had suffered a prior serious felony conviction for assault with a firearm (§§ 245, subd. (a)(2), 667, subd. (a)(1)); and, as to all counts, Keller has suffered a prior serious or violent felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Keller pleaded not guilty and not guilty by reason of insanity to all counts and special allegations although he stipulated at trial he had suffered a prior felony conviction.

Keller did not testify at the guilt phase of his trial. He was convicted on all counts and special allegations.

3. *Keller's Insanity Defense*

Keller, who was 30 years old at the time of his arrest, was diagnosed with bipolar disorder in August 2008 by Dr. Rodney Collins, a psychiatrist who was then treating Keller's mother for the same disorder. Dr. Collins prescribed Depakote, a mood stabilizer, and valium. Dr. Collins testified bipolar disorder is genetically linked and can cluster in families. The disorder usually manifests in males between the ages of 25 and 30 years old.

---

[2]     Statutory references are to the Penal Code unless otherwise indicated.

Keller's friends and family testified Keller had exhibited increased mood swings and paranoia after his release from prison in 2007. In early 2009 Keller's mother died, an event that exacerbated Keller's symptoms. After he acted aggressively and irrationally on a trip to visit his sister in May 2009, Keller's father took him to Brotman Medical Center for an evaluation of his mental condition and possible psychiatric commitment. Keller told an emergency room physician he was suffering from depression and was sometimes hearing voices but left before he could be evaluated by a psychiatrist.

After his arrest Keller was examined at a hospital[3] and then transferred to the Twin Towers jail, where he was housed in the mental health module in part because he appeared confused and could not remember why he had been arrested. Other than his confusion, Keller appeared normal and presented no psychotic features. He scored poorly, however, on a global assessment functioning test. He remained in the mental health unit and received psychiatric care from Dr. Maria Kellner, a staff psychiatrist at the jail. In a session on November 2, 2009, approximately five weeks after his arrest, she found him to be distraught and confused with a blunted affect and vacant eye contact. He did not remember the events leading to his arrest, believed he was in jail for killing his mother and told Dr. Kellner he thought everyone was trying to hurt him.[4] Dr. Kellner did not suspect he was malingering but elected not to medicate him immediately because she lacked a medical history indicating previous illness or treatment. In a second session two weeks later, Keller told Dr. Kellner he recalled some details about the car chase and had been prescribed antipsychotic medication in the past, although he had not taken it. After a third visit Dr. Kellner prescribed an antidepressant and an antipsychotic for Keller, which she subsequently noted improved his functioning and ended the voices he had been hearing. Dr. Kellner, who was not qualified as a forensic psychiatrist and therefore gave

[3]    Keller was rambling and incoherent in the early morning hours after his arrest. A urine test detected marijuana but no other drugs in his system.

[4]    A week after this session Keller was referred to the urgent care department for possible removal of a fatty tumor on his torso. Keller told the physician specialist who examined him that aliens had abducted him and implanted a fetus under his skin on his lower back. The physician specialist believed Keller was mentally deranged.

no opinion as to Keller's sanity at the time he committed the crimes, stated she did not believe he had been exaggerating his symptoms and made a sincere attempt to get better.[5]

Two forensic psychiatrists, Dr. Kaushal Sharma and Dr. Jack Rothberg, testified to their opinions Keller was legally insane at the time he committed the crimes. Dr. Rothberg found crucial the fact that Keller initially drew attention to himself by failing to comply with the traffic break initiated by Officer Ryals and later described the event in terms that showed a delusional state, suggesting his ability to perceive reality was compromised. Dr. Sharma pointed to Keller's acute paranoia in the months before his arrest, including complaints others were trying to hurt him, and his failure to understand what was happening during the chase.[6]

Keller testified on his own behalf during the sanity phase. He had first experienced anxiety attacks as a teenager and bought a gun to protect himself. He was convicted of assault in 2003 after an incident in which he shot one of four young men who had cornered him at a shopping mall. He believed he had acted in self-defense although the bullet struck the victim in the buttock. After his release from prison, he moved in with his mother, who suffered from bipolar disorder and other mental and physical problems. After he too was diagnosed with bipolar disorder, he started taking a mood stabilizer but quit because the medicine made him tired. Instead, Keller self-medicated daily with marijuana and occasionally used cocaine and ecstasy. He began hearing voices in early 2009 after his mother died. When his father took him to the hospital for evaluation, Keller left because the voices in his head told him to do so.

---

[5]     Medications and dosages were altered over the course of six months to improve Keller's functioning and by the time the case was tried he was no longer hallucinating. A second psychiatrist at the jail concurred with Dr. Kellner that Keller was not malingering.

[6]     Keller described seeing multiple lights moving back and forth, which he did not understand, and told Dr. Sharma he believed he could pass through objects, which appeared transparent to him. Officer Ryals reported that Keller changed lanes during the chase, placing him behind the SUV, and did not slow down or take evasive action before rear-ending it.

Because the medication had reduced his symptoms, Keller was able to recall some of the events preceding his arrest. He had not slept the previous night because he believed his neighbor had put spiders in his house. Late in the afternoon he confronted the neighbor about the spiders and was told he needed help. Keller believed the neighbor was threatening him and, taking his gun, drove away in his car. Entering the freeway, he saw Officer Ryals's car but did not understand what he was doing. When Ryals ordered him off the freeway, he became afraid Ryals wanted him to drive to an isolated area and had been sent to kill him. Once Keller reached Ventura Boulevard, he drove with no thoughts other than to escape the officers who wanted to kill him; he drove blindly through stoplights never thinking he might hurt himself or someone else. He believed his speedometer was instructing him where to drive; for instance, as it bore to the right, he headed the car to the right. He did not see the pedestrian he hit but felt the impact and assumed he had hit another car. He did not slow before hitting the SUV because it appeared transparent to him and he believed he could pass through it. Keller shot at the chasing police car when it tried to ram his car because he thought the officer was trying to kill him. He ducked when Officer Hernandez returned fire, and his car rolled to a stop at a fence.

The People presented evidence of Keller's drug use and the recovery of slightly less than an ounce of marijuana from his car, along with a scale and $1,580 in cash. Dr. Charles D. Kreuter, the jail psychologist who initially assigned Keller to the mental health unit at intake, testified Keller had been alert and oriented and had presented no psychotic features. Dr. Kreuter recommended Keller be housed in the mental health unit because he was unable to remember why he had been arrested. Keller told Dr. Kreuter he had been experiencing anxiety and had become aggressive, for which he was taking Valium.

Dr. Barry T. Hirsch, a forensic psychologist, evaluated Keller and concluded Keller was sane when he led police on the chase. Dr. Hirsch agreed Keller was depressed and had a pre-existing anxiety disorder but interpreted his responses to questions contained in the Minnesota Multiphasic Personality Inventory test (MMPI-2) as

7

indicative of manipulation by Keller to appear more disturbed than he was. Keller's desire to flee the police was a product of his rational desire to avoid capture while in possession of marijuana, drug paraphernalia, cash and a gun, which would constitute parole violations and subject him to reincarceration. He also showed no signs of mental disease when he was booked into custody or when he was evaluated by Dr. Kreuter three days later.

4. *The Jury Deliberations on Keller's Sanity Defense*

The jury began deliberations on January 31, 2012. At the beginning of the third day of deliberations, the foreperson gave the court a note complaining one of the jurors (Juror 100) had spoken of her own experience with a six-year-old student diagnosed with bipolar disorder whose behavior had convinced her Keller was psychotic when he was tased because he did not respond normally to the electric charge. The note advised the court that Juror 100 had begun crying when criticized by other jurors for relying on outside information and that Jurors 100 and 48, as well as a third juror, had "repeatedly stated that the prosecution did not 'prove' that [Keller] was sane." The note also asked the court to "take corrective steps" to allow deliberations to continue "unhindered by misconduct and flagrant defiance of the instructions."

The court informed counsel of the note. Later that morning, the foreperson submitted a second note stating "Juror [48] feels that deliberations are so stressful and upsetting that it is affecting her health. She asks to step down as a juror." During a break, however, Juror 48 asked to withdraw the note.

Discussing the notes with the court, Keller's counsel asked that Juror 48 be allowed to continue to deliberate and opposed the prosecutor's request to remove Juror 100 for misconduct. The court determined there was no basis to remove Juror 100 and agreed to instruct the jury to confine its discussion to evidence admitted at trial. Out of the presence of the other jurors, the court asked Juror 48 whether she felt she could continue; and she responded, "I'm okay. . . . [Y]ou have people yelling. They're . . . attacking me because . . . I don't agree with [them]. . . . [But] when they saw me get

8

upset, they kind of calmed down." Asked again whether she could continue, she answered, "Yeah. No. I'm fine. I'll be alright."

After the jury returned, the court instructed the jurors to rely only on the evidence presented in the courtroom and not to express any specialized knowledge they might have. The court also instructed that Keller bore the burden of proving he was legally insane when he committed the crimes. Finally, the court cautioned, "Do not hesitate to change your mind if you become convinced you are wrong. But do not change your mind just because other jurors disagree with you. [¶] Keep an open mind and openly exchange your thoughts and ideas about this case. Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other." (See CALCRIM No. 3550.)

The following day, at the beginning of the lunch recess, Juror 48 submitted a note to the court asking to be relieved from jury duty. When asked about the note, she stated, "My opinion doesn't count in there. I have people attacking me on all sides because I don't agree with them. . . ." Asked if she could continue, she added, "I don't think I can do it. My heart is pounding every time I have people yelling at me. . . . It's like there's no order between us all. [Y]ou try to give your opinion, but 'oh no. You're wrong.' And they think they're right. But it's like I keep telling them, 'it's my opinion.'. . . But, . . . I can't convince anybody, and they're not convincing me. . . ." After speaking with Juror 48, the court reconvened the jury, again instructed them pursuant to CALCRIM No. 3550 and told the jurors to remember everyone was equal in the jury room and to bring down the emotional level. The jury continued to deliberate.

The jury started its fifth day of deliberations on Monday, February 6, 2012. At 2:20 p.m. the jury sent a note to the court stating they were at an impasse. Told the jury had arrived at verdicts on counts 8, 9 and 10 (possession of a firearm by a felon and resisting arrest), the court directed the jurors to return and execute those verdicts. The jury found Keller was sane on those counts.

9

Returning to the courtroom, the foreperson advised the court the jury was split 11 to 1 on all remaining counts. Asked how the court could assist in resolving the dispute, the foreperson noted the dispute centered on the burden of proof. When the court asked if further instructions would help, the foreperson stated, "An indication has been made, but then retracted, but then made again, that no matter what is said, one juror will not change his or her mind, no matter what is said. Now, whether or not that was said in the heat of the moment, I do not know, or if it is actually true. I would welcome any clarification or further argument that would help us come to a unanimous decision."

At 3:22 p.m., after conferring with counsel, the court crafted a special instruction from portions of CALJIC Nos. 4.00 and 2.50.2 and read it to the jury: "The defendant has the burden of proving legal insanity at the time of the commission of the crimes by a preponderance of the evidence. [¶] 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your findings on that issue must be against the party who has the burden of proving it. You should consider all the evidence bearing on every issue, regardless of who produced it." The court also explained that CALJIC and CALCRIM instructions described the same concepts but used slightly different language.

Keller's counsel moved for a mistrial based on the undue influence exercised over Juror 48, which the court denied. The jury deliberated for an additional half hour before reaching verdicts on the remaining counts finding Keller was sane at the time he committed those crimes.

5. *Sentencing*

The trial court sentenced Keller to an aggregate state prison term of 123 years to life, calculated as consecutive terms of 15 years to life, doubled under the three strikes law, on count 1; 15 years to life for the attempted premeditated and deliberate murder of a police officer (§ 664, subd. (f)), doubled under the three strikes law, plus 20 years for the personal use and discharge of a firearm (§ 12022.53, subd. (c)) and five years for a prior serious felony (§ 667, subd. (a)) on count 2; and 15 years to life for the attempted

10

premeditated and deliberate murder of a police officer, doubled under the three strikes law, plus six years eight months (one-third of the 20-year term) on the firearm enhancement on count 3. Sentence on all other counts and enhancements—other than count 9—was either stayed or ordered to be served concurrently. On count 9 (§ 69 [resisting a peace officer]) Keller was sentenced to one year four months (one-third the middle term of 24 months, doubled under the three strikes law).

## DISCUSSION

1. *Keller's Conviction for the Attempted Murder of Caballa Was Supported by Substantial Evidence*

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and [kills] a bystander instead is subject to the same criminal liability that would have been imposed had "'the fatal blow reached the person for whom intended.'" [Citation.] In

11

such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.'" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 797.) However, the crime of attempted murder requires a showing of specific intent to kill: "'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.'" (*People v. Smith* (2005) 37 Cal.4th 733, 751, quoting *People v. Bland* (2002) 28 Cal.4th 313, 328; see *People v. Perez* (2010) 50 Cal.4th 222, 232 ["intent to kill does not transfer to victims who are not killed, and thus 'transferred intent' cannot serve as a basis for a finding of attempted murder"]; *McCloud,* at p. 797.) "Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.'" (*Smith,* at p. 740.)

Keller contends the evidence was insufficient to show he intended to kill Caballa, Officer Hernandez's civilian ride-along passenger, when he shot at Hernandez's patrol car. The central premise of this contention—that a shooter must specifically know of and intend to kill each individual in his line of fire—has been repeatedly rejected. For instance, in *People v. Stone* (2009) 46 Cal.4th 131 the Supreme Court concluded a shooter who fired a single shot into a group of people, intending to kill one of the group but not knowing or caring which one, was properly convicted of a single count of attempted murder. (*Id.* at p. 134.) As the Court explained, "The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being." (*Ibid.*)

There is no requirement, therefore, that Keller specifically intended to kill Caballa, as opposed to someone else, when he fired at the patrol cars. The intent to kill a human being is readily inferred from the act of shooting a firearm at persons known or unknown. For instance, the firing of a single bullet at a group of people will support an attempted murder conviction, but in most cases, only one count.[7] In *People v. Perez, supra,*

---

[7]    Under the right circumstances, a single shot may support more than one count of attempted murder. In *People v. Smith, supra,* 37 Cal.4th 733 the defendant fired a single bullet into a slowly moving car, narrowly missing a mother and her infant son, yet was convicted of two counts of attempted murder. (*Id.* at p. 737.) The Supreme Court

12

50 Cal.4th at page 224, the defendant "fired a single bullet at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven peace officers and a civilian . . . ." The defendant believed he was shooting at rival gang members, but was not "targeting any particular individual when he fired at the group." (*Ibid.*) The Supreme Court observed that "a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon" (*id.* at p. 230), but concluded the evidence supported only one conviction of attempted murder. (*Ibid.*) Based on the reasoning in *Perez*, the court in *People v. McCloud, supra,* 211 Cal.App.4th 788, concluded shooters who fired ten shots at a group of 400 people, killing two, could be guilty of only eight counts of attempted murder, rather than the 46 counts charged. (*Id.* at p. 807.)

Keller may have missed but he fired approximately 14 shots; both patrol cars were struck by bullets fired by Keller; and Hernandez testified he saw and heard gunfire directed at his car. There is no meaningful way to distinguish between the risk of harm to Officers Ryals and Hernandez, on the one hand, and Caballa, on the other hand, who was seated next to Hernandez in the passenger seat.[8] (See *People v. Smith, supra,* 37 Cal.4th at p. 741 ["[t]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill'"].) The jury had ample evidence from

rejected the contention insufficient evidence showed the defendant had intended to kill the baby and affirmed both convictions: Evidence the "defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both." (*Id.* at p. 743; see also *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690-691 [affirming two convictions of attempted murder based on the firing of a single bullet at two police officers who were crouched one behind the other in the line of fire].)

[8]     Indeed, Keller testified in the sanity phase he was trying to stop the patrol cars from pursuing him. He was not targeting any particular individual.

13

which it could infer the specific intent to kill Caballa, whether or not Keller knew of his presence.

Keller argues Caballa was not within the "kill zone" created by Keller's gunfire and thus was not in the zone of harm created by the shots he fired. (See *People v. Bland, supra,* 28 Cal.4th at pp. 329-330.) "Under *Bland,* 'a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force *designed and intended to kill everyone in an area around the targeted victim* (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*People v. McCloud, supra,* 211 Cal.App.4th at p. 797, quoting *People v. Smith, supra,* 37 Cal.4th at pp. 745-746; see also *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 ["the concurrent intent doctrine permits a rational jury to infer the required express malice [or specific intent to kill] from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm"].) The kill zone theory "is not a legal doctrine requiring special jury instructions"; "[r]ather, it is simply a reasonable inference the jury may draw in a given case." (*Bland,* at p. 331, fn. 6; accord, *McCloud,* at pp. 802-803.)

The People here did not rely on a kill zone theory; and, quite properly the jury was not instructed under that theory,[9] which was unnecessary to its resolution of the attempted murder charges. There was no evidence Keller targeted any particular person and, by using extraordinary lethal force to accomplish that murder, placed unintended targets at risk. (See *People v. Stone, supra,* 46 Cal.4th at pp. 138, 140 ["[t]he kill zone theory . . .

---

[9]     CALCRIM No. 600, the instruction for attempted murder, contains an optional paragraph that was not given here: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of [the victim], the People must prove that the defendant not only intended to kill [the primary target] but also either intended to kill [the victim], or intended to kill everyone within the kill zone. . . ."

14

addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons"; "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind"].) As the Court pointed out in *Stone,* "an indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Id.* at p. 140.) Because the jury was otherwise properly instructed on the elements of attempted murder, a kill zone instruction was superfluous. (See *People v. McCloud, supra,* 211 Cal.App.4th at p. 803 ["[i]f the evidence supports a reasonable inference that, as a means of killing the primary target, the defendant specifically intended to kill every single person in the area in which the primary target was located, then the prosecutor can make that argument and the jury can draw that inference without the aid of a kill zone instruction—the ordinary instructions on attempted murder will provide all of the necessary legal tools"].)

   2. *The Finding of Sanity Is Supported by Substantial Evidence*

The defense of insanity "shall be found by the trier of fact only when the [defendant] proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)[10] A defendant's mental illness or mental abnormality, in whatever form either may appear, does not necessarily equate to legal insanity; a defendant may be mentally ill or mentally abnormal but not be legally insane at the time he or she committed the charged offenses. (*People v. Coddington* (2000) 23 Cal.4th 529, 608, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see CALCRIM No. 3450.)

Keller contends the evidence he was insane when he committed the offenses was overwhelming and the jury's finding to the contrary was not supported by substantial

---

[10]     Although section 25, subdivision (b), uses the conjunctive "and" rather than the disjunctive "or," the Supreme Court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity may be returned. (*People v. Lawley* (2002) 27 Cal.4th 102, 170; *People v. Skinner* (1985) 39 Cal.3d 765, 769.)

15

evidence. Both Drs. Sharma and Rothberg concurred Keller was insane at the time he committed the offenses, and Dr. Kellner, his treating psychiatrist at the jail (although not a forensic psychiatrist), testified he was seriously mentally ill in the months after the crimes until she started him on a course of medication.

Although this was strong evidence, "the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it." (*People v. Drew* (1978) 22 Cal.3d 333, 351.) "Because the burden was on the defense to show by a preponderance of the evidence that [Keller] was insane, before we can overturn the trier of fact's finding to the contrary, we must find as a matter of law that the [jury] could not reasonably reject the evidence of insanity." (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059.)

This we cannot do. The People's expert, Dr. Hirsch, a forensic psychologist, based his opinion Keller was not insane on Keller's apparent lack of severe symptoms preceding the offenses and his performance on the MMPI-2 that suggested he was exaggerating his impairment at the time. According to Dr. Hirsch, Keller's actions on the day of the chase were easily seen as goal-directed behaviors, driven by his desire to avoid pursuit and arrest that would have likely returned him to prison for violating parole. The jury's acceptance of this testimony was not unreasonable as a matter of law.[11]

---

[11]    Indeed, the jury was entitled to find Keller sane even if Dr. Hirsch had not testified to such a conclusion. (See, e.g., *People v. Skinner*, *supra*, 185 Cal.App.3d at p. 1059 ["While it is true that the expert witnesses . . . unanimously agreed that appellant was insane at the time of the incident, this is not determinative. . . . [¶] The value of expert testimony in assisting the trier of fact on the sanity question depends on the material from which the opinion is drawn and on the reasoning of the witness."]; *People v. Green* (1984) 163 Cal.App.3d 239, 243 ["expert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected, especially where experts are asked to speculate about a defendant's state of mind at the moment the crime was committed"].)

3. *The Trial Court Did Not Abuse Its Discretion by Declining To Conduct a Hearing on Juror Misconduct or by Directing the Jury To Continue To Deliberate*

Keller contends the trial court violated his right to a fair trial by declining to conduct a hearing into whether jurors had engaged in misconduct and then directing the jury to keep deliberating when, instead, it should have declared a mistrial. Keller argues the court's actions forced Juror 48, the presumed holdout juror, to capitulate and to alter her vote after deliberations for four and one-half days failed to yield verdicts on Keller's insanity defense to the murder and attempted murder charges.

A trial court is vested with substantial discretion in managing the deliberations by a jury and ensuring it reaches a fair verdict. Although a trial court has a "duty to conduct a reasonable inquiry into juror misconduct consistent with defendant's right to a fair trial" (*People v. Barber* (2002) 102 Cal.App.4th 145, 150), "the decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engelman* (2002) 28 Cal.4th 436, 442.) "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) The investigation "'must be conducted with care so as to minimize pressure on legitimate minority jurors.'" (*People v. Haskett* (1990) 52 Cal.3d 210, 238.)

Further, "[a] trial court may ask jurors to continue deliberating when, in the exercise of its discretion, it finds a 'reasonable probability' they will be able to reach agreement." (*People v. Howard* (2008) 42 Cal.4th 1000, 1029; § 1140.)[12] "The

---

[12] Section 1140 provides, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and

17

determination under this section of whether a reasonable probability of agreement exists 'rests in the discretion of the trial court' . . . [and] a court 'is not bound to take as final the statement of the [jurors] that they cannot agree upon a verdict.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 159.) In exercising its discretion to order further deliberations, however, the court must avoid coercing dissenting jurors to displace their independent judgment "'in favor of considerations of compromise and expediency.'"[13] (*People v. Breaux* (1991) 1 Cal.4th 281, 319; see *People v. Pride* (1992) 3 Cal.4th 195, 265 [instruction to jury, which had been deadlocked at 11 to one for days, to "continue deliberating" was not inherently coercive as "jury was never told it must reach a verdict, nor were any other constraints placed on their deliberations"].) "'Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case.'" (*People v. Russell* (2010) 50 Cal.4th 1228, 1252.)

The circumstances here do not support Keller's contentions the trial court abused its discretion either by failing to hold a hearing on juror misconduct or by directing the jury to continue deliberations. The record contains ample evidence of the internal dynamics of the jury, which would not likely have been clarified by a hearing. As discussed, the original note sent by the foreperson complained chiefly of Juror 100's reliance on her experience as a teacher to support her belief Keller was insane at the time of the offenses.[14] Defense counsel did not seek a hearing at this point but argues the

---

rendered it in open court, unless . . . at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

[13]     A coercive instruction to continue deliberations is known as an "*Allen* charge." (See *Allen v. United States* (1896) 164 U.S. 492 [17 S.Ct. 154; 41 L.Ed.2d 528].) In *People v. Gainer* (1977) 19 Cal.3d 835 the Supreme Court held "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Id.* at p. 852; see also *People v. Valdez, supra,* 55 Cal.4th at p. 163 [examining *Gainer*]; *People v. Butler* (2009) 46 Cal.4th 847, 883.)

[14]     Raising a new argument on appeal Keller argues the court's instruction to the jury in response to the complaint about Juror 100 violated his right to an impartial jury

18

exchange revealed juror misconduct in the form of psychological pressure that reduced several jurors to tears during acrimonious deliberations.  Asked about her concerns, Juror 48 acknowledged she had been shaken by the contentiousness but agreed to proceed.  The trial court instructed the jury to keep open minds and to treat each other courteously during discussions.

The court's rereading of the burden of proof instruction, which clarified the defendant (and not the People) bears the burden of establishing insanity, appears to have led Juror 100 (as well as a third juror) to change her vote.  Juror 48's note to the court the next day mentioned no other jurors and simply stated she could not continue to deliberate because some jurors were yelling at her.  After discussing her concern with the court, however, she again agreed to continue.  The court read CALCRIM No. 3550 for the third time and asked jurors to reduce the emotional level in the jury room.

Juror 48 did not contact the court again.  Instead, the foreperson sent a note to the court the next day advising the jury was at an impasse.  Without revealing the direction the jury was leaning, the foreperson disclosed it was split 11 to one.  The foreperson then told the court a juror had suggested no amount of discussion would change that vote.  It was at this juncture defense counsel asked if the court was going to inquire further about juror misconduct, apparently referring to the pressure brought to bear on Juror 48, but the court replied, "Absolutely not."  Defense counsel did not further object and did not seek a mistrial.  Instead, the court read a special instruction on the burden of proof and asked the jury to continue deliberations.  Half an hour later, the jury reached verdicts on the remaining counts.

At no time during these events did the court emphasize the numerical split between jurors, tell the jury it must reach a verdict or suggest the jury's failure to reach a

_____

because it improperly chilled the dissenting jurors from voicing their legitimate opinions. However, defense counsel failed to object at the time to the court's proposed instruction or to seek a mistrial on this ground.  Accordingly, Keller has forfeited this issue on appeal.  (See *People v. Foster* (2010) 50 Cal.4th 1301, 1341 [court questioned jurors, invited counsel to question them and admonished them; defense counsel's failure to object or seek a mistrial forfeits claim of juror misconduct].)

verdict would result in an expensive retrial. In short, the court's responses contain none of the flaws described in *People v. Gainer*, *supra,* 19 Cal.3d 835. Lacking California authority, Keller urges us to follow the decision in *Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976 (*Jiminez*), in which the district court, when the jury reached an impasse after five hours of deliberation, "effectively instructed the jurors to make every effort to reach a unanimous verdict." (*Id.* at p. 981.) After a second impasse one juror remained in the minority, but the court directed them to continue deliberating through the afternoon; the jury returned a verdict two hours later. (*Ibid.*) The Ninth Circuit concluded the court had given a "de facto *Allen* charge," reasoning "the trial court's implicit approval of the 'movement' toward unanimity . . . sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (*Ibid*.) Further, the court stated, "In reaching this conclusion, we do not question the practice of California judges to ask the jury its numerical division after an impasse. We conclude, however, that under established due process standards, the comments and conduct of the trial court in this case crossed the line between neutral inquiry and coercive instruction." (*Ibid.*)

Not only are we not bound by this federal decision (see, e.g., *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [federal authority is not binding in matters involving state law]), but also *Jiminez* is distinguishable on its face. The Ninth Circuit criticized the district court for its "failure to counterbalance the implication of its questions and comments by instructing the hold-out juror not to surrender his or her sincere convictions. . . ." (*Jiminez, supra,* 40 F.3d at p. 981.) In contrast, the trial court here instructed the jury three times with CALCRIM No. 3550, which emphasizes each juror's individual role: "It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you. [¶] . . . Please treat one

20

another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other." In addition, the last time the court gave this instruction, it added, "What that means is, you have to have a reasoned discussion, where people aren't talking over each other, and that everyone has a fair chance to be heard. . . . Whether you have a big personality or a little personality, everyone is a total equal in that jury room . . . ."

These instructions adequately protected Keller's due process right to a fair trial. Indeed, the trial court's efforts to focus the jury were commendable. The conduct of some of the jurors was apparently less so. Nonetheless, heated disagreements between jurors, expressions of frustration at the pace of deliberations or with other jurors, and rude persuasion tactics are inherent in human group dynamics and do not constitute misconduct or impeach the validity of a verdict. (See, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1351-1352 [emphatic expression of opinion by several jurors early in deliberations not misconduct]; *People v. Cox* (1991) 53 Cal.3d 618, 693-695 [not misconduct where jurors violated nonsmoking order, bothering nonsmoking jurors], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Keenan* (1988) 46 Cal.3d 478, 540-541 [not misconduct where majority juror threatened to kill hold-out juror]; *People v. Orchard* (1971) 17 Cal.App.3d 568, 572-574 [not misconduct where foreperson angrily chastised minority juror for 10 to 15 minutes].)

4. *The Court Did Not Abuse Its Discretion in Denying Keller's Post-verdict Request for the Release of Personal Juror Information*

After a criminal jury verdict is recorded, all identifying juror information is sealed until further order of the trial court. (Code Civ. Proc., § 237, subd. (a)(2).) Code of Civil Procedure section 206, subdivision (g), permits a defendant to petition the trial court, pursuant to Code of Civil Procedure section 237, for access to personal juror identification information—that is, jurors' names, addresses, and telephone numbers— upon a showing that such information is necessary for a new trial motion or any other lawful purpose. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087.) A motion for disclosure of juror information must be "supported by a declaration that includes facts

21

sufficient to establish good cause for the release of the juror's personal identifying information.  The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information. . . ."  (Code Civ. Proc., § 237, subd. (b).)

Keller filed a post-verdict petition under Code of Civil Procedure section 206, subdivision (g), citing the evidence that Jurors 100 and 48 had been subjected to improper influence by other jurors.  The trial court denied the petition on the ground Keller had failed to establish a prima facie showing of good cause for the information.  We review this decision "under the deferential abuse of discretion standard."  (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; accord, *People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

There was no abuse of discretion here.  As the trial court explained, the facts cited by Keller did not rise to the level of juror misconduct.  Jurors had asked multiple questions during their deliberations, and the court, as well as counsel, had been apprised of the jurors' concerns and had addressed them.  In particular, the court noted, the concerns of Juror 48 had been fully investigated at the time they were raised.  Moreover, the questions posed in Keller's petition would require inquiry into the subjective thought processes of the jurors, which is prohibited by Evidence Code section 1150.[15]

5. *The Sentence Must Be Modified*

Keller contends the trial court erred by combining determinate terms for the firearm-use-and-discharge enhancements (§ 12022.53, subd. (c)) (counts 2 and 3) and the prior serious felony conviction enhancement (§ 667, subd. (a)) (count 2) with the

---

[15]    Evidence Code section 1150, subdivision (a), provides:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to the show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

indeterminate terms imposed on the murder and attempted murder counts into single, aggregate indeterminate terms. He urges remand is necessary for resentencing.

Keller's counsel made a similar objection in the trial court, arguing the manner in which the court pronounced sentence on the attempted murder counts (55 years to life on count 2) could cause prison officials not to credit Keller properly for the time served under those enhancements. Keller is technically correct. Count 2, for example, should state a term of 30 years to life plus 25 years, not 55 years to life. But, as the court advised at the sentencing hearing, the abstract of judgment properly distinguishes between the indeterminate and determinate terms for each count; the court's use of the common shorthand for the aggregate sentence is entirely harmless, if error at all. No remand is necessary.

As Keller's appellate counsel forthrightly acknowledges, the trial court did err in sentencing Keller to one third of the 20-year enhancement on count 3. Enhancements to indeterminate terms are not subject to any reduction. (See *People v. Felix* (2000) 22 Cal.4th 651, 656.) Additionally, because the consecutive sentences imposed for counts 1, 2 and 3 are each indeterminate life terms, the court further erred in imposing a one-third-the-middle-term "subordinate term" on count 9, resisting arrest, rather than a fully consecutive term of 24 months, doubled under the three strikes law. (*Id.* at p. 655; *People v. Garza* (2003) 107 Cal.App.4th 1081, 1094 [when a defendant is sentenced to both a determinate and an indeterminate sentence, "'neither term is "principal" [n]or "subordinate." *They are both considered and calculated independently of one another*'"].)[16] Accordingly, we modify the judgment to include a full 20-year firearm enhancement on count 3 and a consecutive determinate term of four years on count 9.

---

[16] An unauthorized sentence may be corrected at any time whether or not there was an objection in the trial court. (*People v. Smith* (2001) 24 Cal.4th 849, 854.) "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstances in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) In such circumstances "[a]ppellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*Ibid.*)

## DISPOSITION

The judgment is modified to reflect a 20-year determinate term enhancement pursuant to section 122022.53, subdivision (c), on count 3, rather than a reduced term of six years eight months, and a consecutive four-year term on count 9, rather than a reduced term of one year, four months, and is affirmed in all other respects. The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.


We concur:


WOODS, J.


SEGAL, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.